TOWN OF SUDBURY *vs.* CHARLES F. SCOTT, individually and as trustee,[1] & others.[2]

Suffolk. November 5, 2002. - May 1, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Taxation,* Real estate tax: agricultural and horticultural land; Real estate tax: assessment. *Municipal Corporations,* Acquisition of real estate. *Real Property,* Agricultural preservation restriction, Option, Specific performance, Right of first refusal. *Intent. Contract,* Sale of real estate, Option, Specific performance.

In an action by a town for specific performance of its option to purchase a seventy-acre parcel of land that was valued, assessed, and taxed as agricultural land under G. L. c. 61A, and sold to a developer without prior notice to the town of the terms of the developer's offer to continue the agricultural use of the land and to notify the town accordingly, the judge erred in allowing summary judgment for the developer, where the town had presented evidence that, if believed, indicated that the developer never intended to use the land for agricultural purposes, and that the developer's minimal agricultural activity after the sale was undertaken to conceal his intent in order to defeat the town's option. [296-302] CORDY, J., with whom MARSHALL, C.J., and SOSMAN, J., joined, dissented.

This court took the opportunity to discuss an issue that was likely to arise at trial, and stated that, if it was determined that a developer acquired for nonagricultural use land that was valued, assessed, and taxed as agricultural land under G. L. c. 61A, it would be necessary to determine when the town received constructive notice of the developer's intention, and whether the town exercised an option to purchase within a reasonable time of receiving such constructive notice. [302-303]

CIVIL ACTION commenced in the Land Court Department on March 27, 2000.

The case was heard by *Peter W. Kilborn,* J., on motions for summary judgment.

---

[1] Of Evergreen Realty Trust.

[2] Brendon Homes, Inc.; Alice Mahoney; Leanne Mahoney; Paul J. Mahoney; Strawberry Hill Farm, LLC; Raymond C. Green, Inc.; Rodman Financial Corp.; and Norwood Cooperative Bank.

We acknowledge the amicus brief filed by the New England Legal Foundation.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul L. Kenny* (*Brian Callahan* with him) for the plaintiff.

*Kenneth J. Mickiewicz* (*Carl K. King & Michael W. Wiggins* with him) for the defendants.

*Christine Hughes,* for New England Legal Foundation, amicus curiae, submitted a brief.

SPINA, J. The town of Sudbury appeals from a judgment of the Land Court declaring that the town did not have a right of first refusal as to Charles F. Scott's offer to purchase a seventy-acre parcel of land (locus) that was valued, assessed, and taxed as agricultural land under G. L. c. 61A. The locus had been sold to Scott without prior notice to the town of the terms of Scott's offer because Scott had agreed with the seller to continue the agricultural use of the locus and to notify the town accordingly. As a result of events in the two months that preceded and the five months that followed conveyance of the locus to Scott, the town brought an action for specific performance of its option to purchase the locus on the same terms as Scott, pursuant to G. L. c. 61A, § 14, alleging that the sale to Scott was for nonagricultural purposes. On cross motions for summary judgment, a judge in the Land Court granted summary judgment for Scott. He concluded that the town's evidence did not show that at the time Scott acquired the locus he intended to use it entirely for nonagricultural purposes. Because there are questions of material fact as to Scott's intentions for the use of the locus at the time he acquired title, we vacate the entry of summary judgment and remand the case to the Land Court for trial.

1. *Facts.* The following facts are undisputed. From 1975 until March 18, 1999, the locus consisted of five lots containing approximately seventy acres of land located in Sudbury. Beginning in 1975 the locus was assessed and taxed as agricultural land pursuant to G. L. c. 61A. During this time the locus was primarily in the ownership of the Mahoney family. On an annual basis the Mahoneys applied to the town for, and received, classification of the locus as agricultural land under G. L. c. 61A, § 4, and, as a consequence, paid a lower amount in property taxes each year than they would have paid if the locus had been assessed at its full market value.

In March, 1999, the Mahoneys, for nominal consideration, transferred ownership of the locus to Strawberry Hill Farm, LLC (Strawberry Hill), a corporation formed and owned by the Mahoneys. Sometime between April and June, 1999, the town's board of assessors was informed of the transfer. On June 8, 1999, the board issued a certificate of tax status[3] based on an affidavit of Leanne Mahoney, dated April 16, 1999, stating that Strawberry Hill would continue the agricultural use of the locus. The certificate stated that no roll-back or conveyance tax was due at that time.

On April, 12, 1999, Strawberry Hill entered into a purchase and sale agreement to sell the locus to Scott, as trustee of the Evergreen Realty Trust (trust), for $1.3 million. The purchase and sale agreement included a rider containing a statement that the locus was valued, assessed, and taxed under G. L. c. 61A, and Scott's warranty that he would continue to use the locus for agricultural purposes.

On May 5, 1999, eight percolation tests and eleven deep observation holes were dug on the locus for purposes of determining the suitability of the soil for septic disposal systems. Those tests were witnessed by an agent of the town's board of health. The tests were done for Tom Inman, who was known to the health director for the town to be a "local developer," and who, as later discovered, was a coguarantor with Scott on the mortgage loans Scott obtained to acquire the locus. Before July, 1999, the town planner met with Scott and discussed possible uses for the locus, including a horse riding ring, a senior residential community, and single-family homes.

The mortgage commitment letter from Scott's lender, dated July 2, 1999, states in paragraph eleven, "*Loan Purpose: Business Purpose*"; in paragraph twelve, "*Borrower has represented, and Borrower's attorney must certify, that the 'rollback taxes' that must be paid in order to remove the Property from its*

---

[3]Under G. L. c. 61A, § 19A, such certification shall be provided to the landowner, on application, after a sale or transfer of c. 61A land. A certificate under § 19A contains a statement of the amount of conveyance or roll-back taxes that are due and payable as a result of transfer or sale to someone who would discontinue the active agricultural use of the property, or a statement that no such taxes are due and payable in cases where the new owner has stated the intention to continue the agricultural use of the property.

*agricultural designation and allow development of the Property*
is less than $350,000"; and in paragraph thirteen, *"Prior to
closing, Borrower shall have prepared by an Engineer, a plan
which divides the Property, other than the 11 acres that contains
the house and barn, into a minimum of 10 Form A lots.* The
Engineer must certify that these lots are buildable." A paragraph
of the commitment letter entitled "Other Conditions" states in
section (e), "At the time of closing, the collateral shall be in
good condition and no eminent domain proceedings *or other
governmental action* shall be pending or threatened"; in section
(f), "Borrower's Attorney must also opine *that Borrower's
acquisition* of the Property (or of the corporate owner of the
property) *does not trigger any rights, for the Town of Sudbury
or anyone else, to acquire the Property upon similar terms"*; in
section (k), "Lender is relying upon the accuracy of the
representations made by Borrower(s) and the truthfulness of the
*plans, reports and documents* given to Lender to induce Lender
into making this loan. The continuing accuracy of such *represen-
tations, plans, documents, etc.* is a condition precedent to
Lender's obligation to lend under this Commitment"; and,
finally, in section (r), *"Borrower and Guarantor(s) warrant and
represent that* no portion of the Property is to be used by them
as a personal residence and that *this loan transaction is solely
for commercial purposes."* (Emphasis added.) A plan prepared
by a land surveying company on July 1, 1999, shows a subdivi-
sion of a portion of the locus.

On July 8, 1999, Scott executed two promissory notes in
favor of his mortgage lender. The notes state: "The undersigned
does hereby attest, certify, represent, warrant and covenant that
*neither the premises nor any portion thereof* described in any
mortgage securing this note *are used or are intended to be used
by the undersigned* or by any person liable hereunder *as a
dwelling, or as a home, and that the proceeds of this transac-
tion are solely to be used for commercial and business purposes
and not for agricultural* or consumer *purposes*, and the
undersigned acknowledges that this attestation, certification,
representation, warranty and covenant has been relied upon by
the holder hereof" (emphasis added).

On July 8, 1999, Strawberry Hill executed a deed of the

locus to Scott, as trustee of the trust. The deed was recorded on July 9, 1999. At the time of delivery of the deed the parties signed an agreement addressing the c. 61A status of the locus.[4] Scott signed an affidavit on July 9 stating that the locus had been conveyed to him as trustee for the trust, and that the trust would continue to use the locus for agricultural and horticultural uses. He sent the affidavit to the board of assessors on the same day. On July 20, 1999, the board issued a certificate of tax status reflecting the change of ownership from Strawberry Hill to Scott, and stating that no roll-back or conveyance taxes on the locus were due at that time.

On September 29, 1999, Scott filed the necessary applications with the town under G. L. c. 61A, § 6, seeking continued assessment of approximately 48.14 acres of the seventy-acre locus under c. 61A for fiscal year 2001. By October, 1999, all horses that had been kept on the locus were removed. On October 7, 1999, six additional percolation tests and seven deep observation holes were dug on the locus and, once again, witnessed by an agent of the board of health. On October 12, 1999, Scott's wife attended a meeting with members of the board of selectmen, the conservation coordinator, and the chairman of the town's planning board, at which time she discussed potential uses for the locus, including senior residential housing and single-family development.

On November 22, 1999, Scott entered into a purchase and sale agreement with Brendon Homes, Inc., to sell approximately twenty-four acres of the locus (twenty-four acres) for the sum of $3 million. On November 29, 1999, counsel for Scott notified the town, pursuant to G. L. c. 61A, § 14, of Scott's intent to sell the twenty-four acres for residential development, and he advised the town of the terms of the offer. On March 27, 2000,

---

[4]The agreement states in relevant part, "1. The Buyer shall execute and file an affidavit with the Board of Assessors of the Town of Sudbury to the effect that the Property is being purchased for agricultural . . . uses. 2. In the event that a conveyance tax is assessed on the sale of the Property to the Buyer pursuant to [G. L. c. 61A, § 12], the Buyer agrees to pay same and to hold the Seller harmless from any loss that may result from the imposition of a conveyance tax on the sale. 3. It is expressly agreed and understood that in the event the Buyer does not continue the agricultural . . . use of the Property, liability for roll-back taxes pursuant to [G. L. c. 61A, § 16,] shall attach to the land and shall be the responsibility of the Buyer."

the town filed its civil action for specific enforcement of its alleged option to purchase the locus for the price Scott had paid. On March 28, 2000, the town sent by certified mail a document dated March 24, 2000, purporting to exercise an option to purchase the entire seventy-acre locus for the same price paid by Scott, as trustee, to Strawberry Hill under their purchase and sale agreement of April 12, 1999, namely $1.3 million. The town also recorded its notice in the registry of deeds. On April 4, 2000, counsel for Scott informed the town that he considered the town's notice of its intention to exercise the option to be nonresponsive because it did not propose to purchase the twenty-four acres that was under contract to Brendon Homes, but rather the entire locus, and because it did not meet the offering price of $3 million. As such, Scott treated it as an offer to purchase and rejected it.

2. *Statutory background.* A summary of the relevant portions of G. L. c. 61A will assist in an understanding of the issues raised in this case.[5]

Chapter 61A provides, in general terms, that the owner of

[5]Chapter 61A is entitled "Assessment and taxation of agricultural and horticultural land." It was added by St. 1973, c. 1118, and was approved December 4, 1973. Authority to enact the statute is derived from art. 99 of the Amendments to the Massachusetts Constitution. Article 99 states: "Full power and authority is hereby given and granted to the general court to prescribe, for the purpose of developing and conserving agricultural or horticultural lands, that such lands shall be valued, for the purpose of taxation, according to their agricultural or horticultural uses; provided, however, that no parcel of land which is less than five acres in area or which has not been actively devoted to agricultural or horticultural uses for the two years preceding the tax year shall be valued at less than fair market value under this article" (approved and ratified by the people Nov. 7, 1972).

A constitutional amendment was necessary to assess and tax agricultural lands based on the land's agricultural use value because art. 10 of the Declaration of Rights requires that no taxpayer's burden should be "relatively greater or relatively less than that imposed upon other taxpayers." *Bettigole* v. *Assessors of Springfield*, 343 Mass. 223, 230 (1961), quoting *Opinion of the Justices*, 332 Mass. 769, 777 (1955). In addition, Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution "forbids the imposition of taxes upon one class of persons or property at a different rate from that which is applied to other classes." *Id.*, quoting *Opinion of the Justices*, 341 Mass. 738, 750 (1960). By statute, property must be assessed at its full and fair cash valuation. G. L. c. 59, §§ 2A, 38. Thus, without the amendment, assessment and taxation at use value would be unconstitutional.

five acres or more of land that has been in agricultural[6] or horticultural (collectively, agricultural) use for the "two immediately preceding tax years" (G. L. c. 61A, § 4), may apply to the board of assessors in the municipality in which the land is located for that land to be assessed, for general property tax purposes, on the basis of its value for agricultural purposes — a value which is generally significantly lower than the property's value under the highest and best use standard on which real property is generally assessed. If the board approves the application, then the land will be assessed only on the "indicia of value which such land has for agricultural . . . uses." G. L. c. 61A, § 10. A landowner must reapply annually for assessment under c. 61A, and certify that "he will immediately notify the board of assessors in writing of any subsequently developing circumstance within his control or knowledge which may cause a change in use of the land covered by such form prior to [the next October first]." G. L. c. 61A, § 6. The annual application is considered to be made under oath. *Id.*

In return for the lowered assessment, and hence lower taxes, the landowner is required to compensate the municipality if and when the land is sold for or converted to residential, commercial or industrial use. Such compensation may take one of three forms. First, under G. L. c. 61A, § 12, the selling landowner may be liable for a conveyance tax.[7] No tax is due from the seller if the purchaser files an affidavit that the land is being purchased for agricultural uses. If the land is not continued in agricultural use after the sale, then the purchaser will be liable for the conveyance tax for which the seller would have been liable. *Id.* Second, under G. L. c. 61A, § 13, if land

---

[6]The judge concluded that the locus was in agricultural use while the land was under the control of the Mahoneys and of Strawberry Hill. Although the parties dispute whether the land is still being actively put to agricultural use, a failure to use the land for agricultural purposes, absent an actual change of use to residential, commercial, or industrial use, does not effect a conversion. See G. L. c. 61A, § 14.

[7]The conveyance tax is applied to the total sale price of the land, if the land is sold within ten years of the date it was acquired or first devoted to agricultural use by the selling landowner, whichever is earlier. The rate of the conveyance tax is ten per cent in the first year, and one per cent less for each following year, so that after ten years of ownership (or use for agriculture), no conveyance tax will be due. G. L. c. 61A, § 12.

ceases to qualify as agricultural land then the landowner is provisionally liable for roll-back taxes.[8] Third, under G. L. c. 61A, § 14, the landowner agrees that the land will not be sold for or converted to a nonagricultural use unless the municipality is "notified of [the] intent to sell for or convert to such other use."[9] The municipality has 120 days after notification to exercise a first refusal option to meet a bona fide offer to purchase, or, in the case of conversion to nonagricultural use, to purchase the property at full and fair market value.[10] *Id.*

If only a portion of land assessed under c. 61A is sold for or

---

[8]Roll-back taxes are the difference between the property taxes actually paid under c. 61A and what would have been paid if the land had been assessed outside of c. 61A, for the current tax year and up to the four preceding tax years. The roll-back taxes only apply if they would exceed the conveyance taxes set forth in § 12 of the statute, in which case no conveyance taxes will be assessed against the property. G. L. c. 61A, § 13.

[9]Simply discontinuing agricultural use does not constitute a conversion, but would trigger the roll-back taxes. See G. L. c. 61A, § 16. Using a portion of the land for a residence for family members or farm workers is not a conversion. G. L. c. 61A, § 14.

[10]General Laws c. 61A, § 14, states in relevant part: "Land which is valued, assessed and taxed on the basis of its agricultural or horticultural use under an application filed and approved pursuant to this chapter shall not be sold for or converted to residential, industrial or commercial use while so valued, assessed and taxed unless the city or town in which such land is located has been notified of intent to sell for or convert to such other use; provided, however, that the discontinuance of the use of such land for agricultural or horticultural purposes shall not be deemed a conversion. . . . For a period of one hundred twenty days subsequent to such notification, said city or town shall have, in the case of an intended sale, a first refusal option to meet a bona fide offer to purchase said land, or, in the case of an intended conversion not involving sale, an option to purchase said land at full and fair market value to be determined by impartial appraisal. After a public hearing, said city or town may assign either of said options to a nonprofit conservation organization . . . . Such notice of intent shall be sent by the landowner via certified mail to the mayor and city council of a city, or to the board of selectmen of a town, to its board of assessors and to its planning board and conservation commission, if any, and said option period shall run from the day following the latest date of deposit of any of such notices in the United States mails. No sale or conversion of such land shall be consummated unless and until either said option period shall have expired or the landowner shall have been notified in writing by the mayor or board of selectmen of the city or town in question that said option will not be exercised. Such option may be exercised only by written notice signed by the mayor or board of selectmen, mailed to the landowner by certified mail at such address as may be specified in his notice of intention and recorded with the registry of deeds, within the option period."

converted to nonagricultural use, then that portion will be subject to roll-back or conveyance taxes, or the municipality's right of first refusal. G. L. c. 61A, § 17.[11] The remainder of the land, so long as it continues to qualify, may continue to be assessed under c. 61A. *Id.*

3. *Summary judgment.* The town argues that it was error to grant summary judgment for Scott, where the town produced sufficient evidence that, if believed, would show that at all material times Scott intended to use the locus for nonagricultural purposes and that he concealed his true intent so as to defeat the town's right of first refusal. The town further argues that it was thus entitled to receive notice of the intended sale from Strawberry Hill to Scott that would trigger its right of first refusal. The town contends that Scott's intentions could be inferred from the development-related activity evidenced by meetings between town officials and Scott or persons acting on Scott's behalf, by the arrangements for percolation and other tests, and by various mortgage documents (the plan showing a subdivision of a portion of the locus, the two promissory notes,

---

[11]General Laws c. 61A, § 17, states: "If, by conveyance or other action of the owner thereof, a portion of land which is valued, assessed and taxed under the provisions of this chapter is separated for a use other than agricultural or horticultural, the land so separated shall be subject to liability for conveyance or roll-back taxes applicable thereto, but such separation shall not impair the right of the remainder of such land to continuance of valuation, assessment and taxation thereunder; provided, that such remaining land continues to qualify under the usage, minimum acreage and other provisions thereof."

Were § 17 to be literally construed, a landowner could reap the benefits of reduced taxes, and then avoid the municipality's right of first refusal under § 14, by first converting all but a five-acre qualifying portion of his property to a nonagricultural use. He would be liable for roll-back or conveyance taxes on the separated land, but the municipality would not have the right to meet an offered bona fide purchase price or to purchase the separated land at fair market value. The Legislature probably did not intend this result.

An interpretation of § 17 that is consistent with the purpose of the statute and in harmony with the statute as a whole, see *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n*, 394 Mass. 233, 240 (1985), would allow the municipality to exercise its first refusal rights as to that portion of the land that is to be separated from the remainder, when sold or converted, as set forth in § 14 of the statute, while the remainder of the land may remain in c. 61A. The language of § 14 is inclusive, referring only to "land [in c. 61A]." Scott's notice to the town of his intent to sell a portion of the locus appears to have been based on this same construction of the statute.

and the mortgage commitment letter). The town further asserts that where notice was not provided and should have been provided, the 120-day period to exercise its right of first refusal has not begun to run.

Scott did not file a counter affidavit, but he filed an affidavit in opposition to the town's motion for a preliminary injunction in which he stated that he purchased the locus as a horse farm for his wife and daughter. His affidavit further states that he sold the standing hay for $725 during the summer of 1999, as well as one cord of wood for $75, and that the horses that had been on the farm remained there after he acquired title, staying until October, 1999. Scott and Brendon Homes argue that only an actual change of use should trigger the town's right of first refusal, and that Scott's subjective intent does not constitute a sufficient basis to trigger the right.

At common law, a right of first refusal ripens into an option to purchase when the condition set forth in the instrument[12] creating the right is met. See *Stone* v. *W.E. Aubuchon Co.*, 29 Mass. App. Ct. 523, 526 (1990). Where notice of the receipt of a bona fide offer to purchase triggers the right, a completed sale to a third party without prior notice of the offer to the holder of the right does not extinguish the right. The holder is entitled to specific performance of the option as to a subsequent owner who purchased with notice of the holder's right of first refusal. See *id.*

"[A]n option may be exercised only in strict compliance with its terms." *Id.* at 527. If the holder of the right does not receive the notice to which he is entitled under the instrument creating the right, then any specified period within which the option must be exercised does not start to run. See *id.* However, circumstances may place the holder on constructive notice that his right of first refusal has been implicated, in which case the holder must investigate and exercise his option within a reasonable period of time. See *id.* at 526, 527.

Under G. L. c. 61A, § 14, a town's right of first refusal ripens into an option to purchase when the town receives notice of an

---

[12]Common-law principles apply to a right of first refusal created by statute. See *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep*, 423 Mass. 81, 89 & n.14 (1996).

intended sale of land under c. 61A for a nonagricultural use. The statute contemplates that buyers and sellers will act in good faith and will notify the town if a sale for such use is intended. If a sale for nonagricultural use is consummated without such notice to the town, then the town's right of first refusal endures. See *Stone* v. *W.E. Aubuchon Co., supra.* A town's option to purchase may be specifically enforced against one who acquired title to land under c. 61A for nonagricultural use, and without notice to the town of the intended sale.[13]

Scott and Brendon Homes argue that only an actual change of use should trigger the town's right of first refusal. The statute states otherwise. Section 14 provides that there shall be no sale or conversion of land under c. 61A to a nonagricultural use unless the town has been given notice of the intended sale or change of use, and 120 days has passed without an exercise of the town's option to purchase or the town notifies the owner within that period that it will not exercise its option. Under the statute, the town's option to purchase is triggered by notice, not by an actual change of use, and notice must precede the sale or change of use.

Scott and Brendon Homes next argue that § 14 "cannot be read to require notice whenever the then owner's (or prospective purchaser's) subjective thoughts reach some undefined level of commitment to convert the farmland (or a portion of it) to a nonagricultural use at some undefined time in the future." The statute does not require someone who is merely considering his options to notify the town of his thoughts. The town's right under § 14 to be "notified of intent to sell for . . . [nonagricultural] use" necessarily includes notice of a buyer's intent to acquire land under c. 61A where the buyer has no intention of continuing the agricultural use of the land. The statute refers

---

[13]Instruments creating an option to purchase land typically contemplate a period within which the option must be exercised and a separate period within which the conveyance must occur. See, e.g., *Tucker* v. *Connors*, 342 Mass. 376, 377 (1961). Where no time is specified for the conveyance, a reasonable time will be implied. Cf. *American Oil Co.* v. *Katsikas*, 1 Mass. App. Ct. 437, 439 (1973) ("the time for exercise of the option is generally considered to be of the essence, but the closing date is not"). The statute requires only that the option be exercised within 120 days of statutory notice; it does not specify the period within which the conveyance must occur. Therefore, a reasonable time within which to close will be implied.

to a specific intent and a specific point in time. The critical date is the date of sale, and the critical intent is the intent to discontinue the agricultural use of the land on acquiring title.[14] In most cases, if not disclosed before sale, that intent will become evident soon after sale when the new owner begins a process of conversion. However, there may be instances where the new owner will continue the agricultural use for a brief period after sale to conceal his true purpose, with the intent to defeat the town's right of first refusal. A town that can establish such intent as of the date of sale, and a failure to give notice, is entitled to specific performance of its option to purchase.

The legislative history supports our conclusion. As earlier noted, G. L. c. 61A was enacted under the authority of art. 99 of the Amendments to the Massachusetts Constitution, which was approved in 1972. The Legislature was concerned with the rapidly decreasing number of farms in the Commonwealth during the 1940's and 1950's, and the resulting loss of a vital resource for the people of the Commonwealth. Between 1955 and 1970 the Legislature commissioned five studies to explore ways to reverse this trend, including the assessment and taxation of agricultural lands at agricultural value.[15] These studies were unanimous in recognizing that real estate taxation

---

[14]Although § 14 refers to an "intent to sell," and it requires the landowner to give notice to the town, the statute must be read in a commonsense fashion to effectuate the purpose of the statute. See *Tilton* v. *Haverhill*, 311 Mass. 572, 577-578 (1942), and cases cited ("statute . . . should be so construed as to make it an effectual piece of legislation in harmony with common sense and sound reason." The right of first refusal, designed to preserve the agricultural use of land, would have little meaning if it were triggered solely by the intent of the seller. Typically, it is the buyer's intent that will determine the use of the land after sale. The seller usually has no interest in the use of the land after sale: the seller's interest in the sale is to exchange one asset, land, for another, usually cash. Strawberry Hill appears to have negotiated the agreement referred to in note 4, *supra*, to address the consequences that can flow from precisely this construction of § 14.

[15]The studies were: (1) Report of the Special Commission on Farm Taxation, 1955 House Doc. No. 2390; (2) Report of the Special Commission on Agricultural Land Use and Preservation of Farming, 1958 Senate Doc. No. 680; (3) Report of a Special Non-Legislative Commission Established to Make and Investigation and Study Relative to the Taxation of Forest Land, Farm Land and Open Space Land, 1966 House. Doc. No. 3769; (4) Legislative Research Council Report Relative to Classification and Assessment of Real Property, 1969 House Doc. No. 5323; and (5) Legislative Research

contributed to the demise of farms, and that it was in the public
interest to preserve and protect the Commonwealth's remaining
farmland.[16] Those studies led to the approval of art. 99 by the
voters, and they provide a legislative history of c. 61A. The
studies voice concern that, although assessment and taxation of
agricultural land at its lower, agricultural use value, rather than
at its highest and best use value, might alleviate some of the
economic burden on farmers, it could also accelerate the worri-
some loss of farmland to speculators and developers who would
acquire and hold agricultural property at a low rate of taxation
while awaiting the opportunity to convert or sell the land for
development.[17]

The Legislature's concern about the loss of farmland to

Council Report Relative to Assessment of Agricultural Land, 1970 House
Doc. No. 5107.

[16]In 1970 House Doc. 5107, the council found that about 900,000 acres of
land in the Commonwealth was devoted to farmland, of which only 235,000
acres was in cropland. Id. at 24, 28. "Less land is devoted to agricultural use
in Massachusetts today than twenty-five years ago. The number of farms has
decreased from 38,000 in 1945 to about 8,000 in 1964. Land used chiefly for
crops totaled about 626,000 acres in 1945 but only about 235,000 acres in
1969." Id. at 28. A recent study of Massachusetts farmland by the department
of resource economics at the University of Massachusetts in Amherst, gave
the following statistics. In 1945 there were 37,007 farms in the Commonwealth.
That number dropped to a low of 4,497 in 1974. It has since risen to 5,574 in
1997. The total acreage in agricultural use in 1974 was 601,734, of which
257,033 was in cropland. In 1997, those numbers were 518,299 and 223,573,
respectively. See Agriculture's Hold on the Commonwealth (2000).

[17]"A basic difficulty with many of these methods of removing or reducing
the pressure of taxes for the development of open land is that *they invite
speculation and the very development they were intended to avoid.* If an open
space is given special treatment or advantage while its owner uses it for an
agricultural . . . use, and that owner then sells his property for development,
he escapes paying his fair share of the costs of those community facilities and
services which have contributed to the increased value of his land. In brief,
his profits are increased at the expense of his neighbors." (Emphasis added.)
1966 House Doc. No. 3769, at 10-11. "Because there is no provision in the
[Maryland] law restricting its application to owner-operated farms nor to
bona-fide farms nor for recapturing any of the tax losses at such time as the
land may be developed or sold to developers, *opportunities exist for specula-
tors to buy and hold tracts of undeveloped land, hiring nearby farmers to cut
hay or the like and thus minimizing taxes until the land is ready for develop-
ment*" (emphasis added). See 1969 House Doc. No. 5323, at 38. "When farm-
ers are faced with rising tax bills and no significant change in their income
. . . pressure develops for some new method of property taxation. Those who
join forces in this cause represent seemingly conflicting points of view. That

speculators and developers is also evidenced by revisions to 1973 Senate Doc. No. 1971. Before the enactment of St. 1973, c. 1118, which inserted G. L. c. 61A, the Legislature deleted a provision that appeared in 1973 Senate Doc. No. 1971, which read: "Except with respect to eminent domain takings, the provisions of this section shall not be applicable to the following: mortgage deeds, deeds to or by the city or town in which such land is located; *strawman deeds* and deeds which correct . . . a deed previously recorded" (emphasis added). The words "strawman deeds" were deleted from the final draft.[18] The redrafting of this section demonstrates a legislative intent to preserve and protect the agricultural use of land by eliminating any language that would facilitate a seller's or a buyer's efforts to evade the provisions of the statute.

The right of first refusal created by § 14 manifests a legislative intent to do more than help to make farming economically feasible by providing a tax incentive. The right of first refusal was intended to help preserve and protect the agricultural use of land by requiring notice to a town before land under G. L. c. 61A is converted or sold for nonagricultural use.

The town has presented evidence that, if believed, indicates

___

is, *speculators can be as interested in lowered property taxes* as the farmer or conservationist" (emphasis added). 1970 House Doc. No. 5107, at 18-19. In referring to the purposes behind roll-back taxes, the 1970 report, *id.* at 21, states, "The purpose of deferred taxation is to discourage speculators who would hold land for near urban uses." Further, that report examined the New Jersey law on which G. L. c. 61A is largely based, and cited a weakness of the law as implemented in New Jersey: "One of the major criticisms of the New Jersey law is that it allows lower property tax benefits on the land whether it is farmer-owned or speculator owned, so long as it meets the requirements of five acres producing an income of $500." *Id.* at 31. Finally, the 1970 report suggested that differential assessment laws will benefit speculators if "(1) the benefits are made available to land which is in the probable path of urban expansion; (2) differential assessment is not effective in holding land in agriculture; and (3) the requirements for obtaining differential assessment are easy to meet and *restrictions on future land use* are few" (emphasis added). *Id.* at 38.

[18] A "straw man" is defined as "A fictitious person, esp. one that is weak or flawed. 2. A tenuous and exaggerated counterargument that an advocate puts forward for the sole purpose of disproving it. — Also termed *straw-man argument*. 3. A third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." Black's Law Dictionary 1434 (7th ed. 1999).

that Scott never intended to use the locus for agricultural purposes, and that Scott's minimal agricultural activity after sale was undertaken to conceal his intent in order to defeat the town's right of first refusal. In these circumstances, specific performance would be warranted.

A person's intent is a question of fact "to be determined from his declarations, conduct and motive, and all the attending circumstances." *Galotti* v. *United States Trust Co.*, 335 Mass. 496, 501 (1957), quoting *Casey* v. *Gallagher*, 326 Mass. 746, 749 (1951). Scott's affidavit to the opposite effect merely places his intent in dispute. Because the issue of Scott's intent at the time he took title is material to the outcome of the case, and because his intent is in dispute, summary judgment was not appropriate. See *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 331 (1994); *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 86 (1984), and cases cited ("The granting of summary judgment in a case where a party's state of mind or motive constitutes an essential element of the cause of action is disfavored").[19]

We take the opportunity to discuss an issue that is likely to arise at trial. Because the town seeks to exercise its option only with regard to the sale between Strawberry Hill and Scott, if it is determined that Scott did acquire the locus for nonagricultural use, then it will be necessary to determine (a) when the

---

[19]The judge found, as fact, that Scott intended "to retain at least a substantial portion of [the] locus in agricultural use." He concluded that §§ 14 and 17 of c. 61A act together to deny the town's "all or nothing" approach, namely, "that if it can be said that part of land sold is to be devoted to a non-exempt use, the town has a right of first refusal to the entire premises." Scott did not disclose this intent in any affidavit. In finding as he did, the judge posed and then decided a question of fact, an exercise that is not appropriate for summary judgment. See *Norwood Morris Plan Co.* v. *McCarthy*, 295 Mass. 597, 603 (1936) ("duty of the trial judge is to determine whether there is a substantial issue of fact and not to try such issue if found to exist"); *Noyes* v. *Quincy Mut. Fire Ins. Co.*, 7 Mass. App. Ct. 723, 726 (1979) (duty of judge is not to conduct trial by affidavits, but determine whether there is substantial issue of fact). The question of the effect to be given an option to purchase a portion of land described in a purchase and sale agreement is one that we have not previously considered, and it is not adequately presented by the record before us. See Annot., 34 A.L.R. 4th 1217 (1984) (option to purchase real property as affected by optionor's receipts of offer for, or sale of, larger tract that includes optioned parcel). The issue may or may not arise at trial.

town received constructive notice that Scott acquired the locus for nonagricultural use, and (b) whether the town exercised its option to purchase within a reasonable time of receiving constructive notice. See *Stone* v. *W.E. Aubuchon Co.*, 29 Mass. App. Ct. 523, 527 (1990).

The judgment is vacated and the matter is remanded to the Land Court for further proceedings consistent with this opinion.

*So ordered.*

CORDY, J. (dissenting, with whom Marshall, C.J., and Sosman, J., join). The obligation imposed by G. L. c. 61A, § 14, that the town be notified of the "intent to sell" property for development purposes is an obligation imposed on the seller, and not the buyer of agricultural land. Because the town neither alleged nor produced evidence that the seller knew or intended anything other than that the sale be for agricultural use, and did not allege or produce any evidence of fraud on the part of the seller, I would affirm summary judgment for Charles F. Scott, as trustee of the Evergreen Realty Trust (trust).

*Background.* On July 8, 1999, Strawberry Hill Farms, LLC, a corporation owned by the Mahoney family, sold five parcels of adjoining land, totaling approximately seventy acres to the trust. The land was sold on the express written representation of the trust that it would continue in use as agricultural land. The total purchase price was $1.3 million.

At the time of the sale, all five parcels were taxed as agricultural land pursuant to G. L. c. 61A, because the Mahoneys had submitted applications for that status on behalf of each of the parcels for the tax year commencing January 1, 1999, and continuing through December 31, 1999. Such applications are required to be submitted annually for approval by the town on or before October 1 of the year preceding the tax year. G. L. c. 61A, § 6. Once approved, the landowner must notify the town in writing of "any subsequently developing circumstance within his control or knowledge which may cause a change in use of the land" before October 1 of the tax year for which the agricultural tax status has been approved. *Id.* On July 9, 1999,

the day after the closing, the trust executed, as the new landowner, an affidavit affirming its acquisition of the parcels and its intent to continue the entire locus in agricultural use.

On September 29, 1999, for the upcoming tax year 2001, the trust filed agricultural tax status applications for only four of the five parcels, totaling forty-nine of the seventy acres. On November 22, 1999, the trust entered into a purchase and sale agreement with Brendon Homes, Inc., to sell it approximately twenty-four acres of the land for the construction of a senior residential community. Twenty-one of these acres were contained in the parcel for which no agricultural tax status had been sought by the trust for 2001, and the remaining three acres were contained in a larger parcel for which such status application had been made on September 29, 1999. The purchase price for the land was $3 million. On November 29, 1999, the trust notified the town of its intent to sell the twenty-four acres for residential development, as required by G. L. c. 61A, § 14. This notification triggered the town's option of either imposing and collecting a "conveyance tax" or a "roll-back tax" (whichever amount was greater) or of purchasing the property for $3 million (assuming it was a bona fide offer). G. L. c. 61A, §§ 12-14. The town had 120 days within which to exercise its option to purchase the property.

On March 24, 2000, the town responded by claiming an option to purchase all five parcels, i.e., the entire seventy acres, for the price of $1.3 million, and on March 27, 2000, it filed this action specifically to enforce that option. The town proceeded on a theory that if, at the time of purchase, a buyer of agricultural land intends to convert, develop, or sell it for residential, industrial, or commercial purposes, sometime in the future, the town's option under G. L. c. 61A to purchase the parcel is triggered. In its view, the trustee (as the buyer) harbored such an intent with respect to the five parcels when the trust acquired the land from the Mahoneys on July 8, 1999. Therefore, the town concluded, it had acquired the option to purchase the seventy acres at the price paid to the Mahoneys by the trust, and the 120-day exercise period had not run its course because the town had not received notice of the buyer's intention to convert at the time of sale.

*Discussion.* General Laws c. 61A, § 14, provides that land

that has been taxed as agricultural land "shall not be sold" for residential, commercial, or industrial development" until notice is given by "the landowner via certified mail" to the town "of [its] intent to sell" the land for those purposes. The literal language of the statute places the burden of notification on the owner of the land, and implicates the explicit intention and knowledge of the landowner-seller, not the latent intention of any buyer. If the Legislature had intended otherwise, it could readily have provided as well that agricultural land not be "purchased" for development without notice to the town by the prospective purchaser of its "intent to purchase" for this purpose. It did not do so.[1]

The town has not alleged that the Mahoneys sold the property for any purpose other than agricultural use, that the Mahoneys had any awareness of the buyer's contrary intent, that the Mahoneys failed to fulfil their responsibilities under the statute, or that the Mahoneys conspired in any manner with the buyer (the trust) to defraud the town of any rights it had under G. L. c. 61A. Rather, the town contends that the notice requirement of § 14 contemplates notice to it of the prospective purchaser's undisclosed intentions for the future use of the property. This is neither consistent with the language of the statute nor necessary to its important purposes. To the contrary, such an interpretation will cast a troubling shadow over the sale of agricultural land if any future conversion of all or even a part of the land for development would permit a town to bring an action seeking to undo the original transaction on the basis that the purchaser had intended all along to convert the property. I cannot conclude that the Legislature intended to create such uncertainty in the conveyance of land. The statute fully protects the interests of cities and towns at such time as agricultural land is about to be

---

[1]The court makes much of a concern that it contends the Legislature had when it enacted G. L. c. 61A, about "speculators and developers who would acquire and hold agricultural property at a low rate of taxation while awaiting the opportunity to convert or sell the land for development." *Ante* at 300. It further notes that as a consequence of this concern, the Legislature deleted a provision in the proposed legislation that would have exempted "strawman deeds" from the notification and recapture provisions of the law. There is, however, no claim in this case that a "strawman deed" was used or is at issue. This legislative history is of little assistance on the issue before us.

converted to another use, by sale or otherwise, without such a potentially disruptive interpretation.[2]

The statutory scheme is directed to owners of agricultural land. It provides a mechanism and a tax incentive by which such landowners can economically continue to use their land for agricultural purposes in the face of increased land values and the increased property taxes that would otherwise follow. It is the landowner who must apply to the local board of assessors each year for the tax exemption, G. L. c. 61A, §§ 4, 6, and the landowner who must notify that board of any likely change in use in the land that might occur within the tax year for which the exemption has been granted. *Id.* It is also the landowner who must pay the roll-back tax (by which the town recaptures the last five years of tax benefits) if the land is sold or converted to development use, even if the landowner has only recently acquired it and did not receive the tax benefits in those prior years.[3]

Similarly, if a landowner intends to convert the land to a use other than the one for which he has sought the agricultural exemption, either by converting the land himself or by selling it for such conversion, he must notify the town of that intention. The town then has an option to purchase the land for its "full and fair market value" (if the landowner is converting it himself),[4] or to match a "bona fide offer" (if the land is to be converted by the landowner through a sale). G. L. c. 61A, § 14.

---

[2] I join the court, *ante* at 297-298, in rejecting the argument of Scott and Brendon Homes that only an *actual change* of use triggers the town's right of first refusal. Once the landowner intends such a change by way of sale or otherwise, the town must be notified.

[3] General Laws c. 61A mentions the "purchaser" of agricultural land only once. Section 12 provides that a landowner who sells his land does not have to pay a "conveyance tax" on the sale if the purchaser submits an affidavit that he is purchasing the land for agricultural use (such as was done here). It further provides that if the acquired land "is not in fact continued in such use," the purchaser is then liable for the conveyance tax that would have been payable by the previous owner on the sale, at least as to that portion of the land that was converted. (Section 17 provides that if a portion of agricultural land is converted to development use, the conveyance tax due is only for the portion of the land converted and not for the remainder.)

[4] The "full and fair market value" of a property is the property's value at its highest and best use, the standard on which real property is generally assessed. See *ante* at 294.

If the town decides not to purchase the land, and instead collects the roll-back or conveyance tax, the land may be developed free from all the encumbrances imposed by the statute.

If the landowner sells the land for agricultural purposes, as happened here, the land continues to be encumbered by the town's rights. If and when the new landowner sells or converts the land for development purposes, the town may exercise its purchase option or enforce its statutory liens for roll-back and conveyance taxes. No matter when the new landowner decides to convert some (or all) of the land, those encumbrances remain in place and the town will receive all of the protections intended by G. L. c. 61A.

What if, as is alleged here, the seller (the Mahoneys) sells the land at a relatively modest price contingent on its continued use as agricultural land (i.e., at its agricultural value) but the buyer (here the trust) secretly harbors the intention to develop the land and sell it for a higher price? The answer is that the seller, not the town, has suffered the harm, if any. General Laws c. 61A does not entitle a municipality to purchase land at its earlier established "agricultural value" when a later sale or conversion to development use occurs. Rather, if the landowner sells the land for development, the town may acquire it at the development price agreed on between the landowner and the prospective developer or, if the landowner intends to develop the land himself, at its "full and fair market value." Under no scenario is the town given an option to purchase the land at its agricultural value. Here, by the explicit terms of the transaction, $1.3 million was the price the Mahoneys received for their land conditioned on its continued use as agricultural land, as the buyer then represented. If the Mahoneys were deceived in this regard, they have resort to their own civil remedies. The town, however, has suffered no loss; it was never entitled to purchase the land at that value.

Finally, the court directs our attention, *ante* at 290-291, to the loan obtained to finance the purchase of the land, and the language set forth in the loan documents to the effect that the loan was for "commercial" or "business" and not for agricultural purposes. While potentially probative of the trust's

truthfulness in its dealings with the Mahoneys, it is of no relevance to the statutory construction question before us.[5]

In sum, I would affirm summary judgment for the trust. The obligation is on the landowner-seller to notify the town of the purpose of the sale, and there was no material fact in dispute regarding the seller's intent or knowledge. As far as the Mahoneys knew, Scott was buying the land for agricultural purposes, and, by law, would be subject to all of the requirements of G. L. c. 61A, § 14, if those purposes later changed.

---

[5]There is no evidence in the record that the Mahoneys had any knowledge of the contents of the financing documents executed between the trust and its bank.