# United States Court of Appeals
## For the First Circuit

No. 05-2710

JOHN HANCOCK LIFE INSURANCE COMPANY;
JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY;
and INVESTORS PARTNER LIFE INSURANCE COMPANY,

Plaintiffs, Appellees,

v.

ABBOTT LABORATORIES,

Defendant, Appellant;

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Torruella and Lipez, Circuit Judges
and Stafford,[*] District Judge.

---

Lawrence R. Desideri, with whom Stephen V. D'Amore, Peter E. Gelehaar, Michael S. D'Orsi, Winston & Strawn, LLP, and Donnelly, Conroy & Gelharr LLP were on brief, for the appellant.
Brian A. Davis, with whom Joseph H. Zwicker, Stacy Blasberg, and Choate, Hall & Stewart LLP were on brief, for the appellee.

---

September 28, 2006

---

AMENDED OPINION**

---

[*]Of the Northern District of Florida, sitting by designation.
** This opinion has been amended solely to comport with sealing orders issued by the district court and this court. The amendments do not in any way affect the substance of the opinion.

**LIPEZ**, <u>**Circuit Judge**</u>.  John Hancock Life Insurance Company and two of its subsidiaries (collectively "Hancock") contracted with Abbott Laboratories ("Abbott") to join in financing the development of some pharmaceutical compounds.  In exchange, Abbott promised to share with Hancock any profits the compounds would generate.  It soon became apparent that a number of the compounds had no good prospect of commercial success.  Abbott scaled back and delayed its planned investment in the joint project.  Arguing that Abbott had failed to uphold its part of the bargain, Hancock stopped contributing funds altogether.  Hancock then sued for a declaratory judgment, asking the district court to rule that, under the contract between the parties, Abbott's delayed investment allowed Hancock to terminate its payments but retain its share of any future profits.  Abbott countersued, arguing that the contract explicitly allowed it to delay its contributions to the project.  The parties consented to have the district court decide the case on the papers submitted, and, on cross motions, the district court entered judgment for Hancock.  Abbott appeals, essentially arguing that the district court incorrectly construed the contract.  We affirm.

## I.

We discuss the contract between Hancock and Abbott and then their course of dealings.  We leave some details for discussion in connection with Abbott's appellate arguments.

-2-

## A.  The contract

In 1999, Hancock and Abbott began negotiating the joint venture at issue.  While the specifics evolved through 40 contract drafts, the basics of the final agreement are relatively simple. Abbott and Hancock would select a "basket" of research compounds that Abbott had identified as possible pharmaceutical products and that Hancock thought were promising.  Hancock would contribute multiple millions each year for four consecutive years towards the development of these compounds.  Abbott would spend at least 1.86 times as much as Hancock over this initial period of development. The parties would share any profits from the compounds for roughly fifteen years from the contract's inception, and Abbott would pay Hancock set amounts when the joint project accomplished certain development or regulatory goals.  In short, Hancock agreed to provide substantial start-up investment for the project, and Abbott agreed to match that investment.  Because Hancock would share profits only for a set number of years, it stood to gain if the compounds were developed quickly (and if they turned out to be useful) and stood to lose if development were delayed (or if the compounds were unsuccessful).

For our purposes, the final contract between the parties, which was signed on March 13, 2001, can be summarized.

● The parties agreed to partner in the development of a basket of  compounds, with each compound thought to have a potential pharmaceutical use.

-3-

● Hancock agreed to reimburse multiple millions of Abbott's spending on the joint project in four multiple million dollar payments – one for each year 2001 through 2004.

● Abbott agreed to provide an additional annual minimum contribution of un-reimbursed funds to the project in each of the four years.

● Abbott also agreed that its and Hancock's combined spending on the project would be "at least" the Aggregate Spending Target over the "Program Term," which the contract defined as "a period of four (4) consecutive Program Years."[1] In other words, by December 31, 2004, Abbott would provide approximately two-thirds of the Aggregate Spending Target to the project above and beyond the one-third of the Aggregate Spending Target that Hancock promised to contribute.

● Abbott was "permitted" to "change its funding obligations [] only as follows":

(a) If Abbott expended Hancock's yearly contribution during a "Program Year" but did not contribute its annual minimum contribution of its own un-reimbursed funds, Abbott could "carryover" its obligation to the following year. The balance of Abbott's yearly obligation, termed the "Annual Carryover Amount," would be added to Abbott's minimum contribution for the "subsequent Program Year." If Abbott carried over its contribution, Hancock's obligations for the "subsequent Program Year" would be suspended until Abbott spent the "Annual Carryover Amount."

(b) If Abbott did not spend the entire Aggregate Spending Target "during the Program Term," it could "carryover" the balance to the "subsequent year commencing immediately after

---

[1] The contract defined a "Program Year" as a full calendar year beginning on January 1 and ending on December 31, except that the first "Program Year" would be shortened to begin of the day the contract was signed and to end on December 31, 2001.

-4-

the end of the Program Term." If there was such a carryover, the difference between the Aggregate Spending Target and the amount actually spent by the end of the "Program Term" would be called the "Aggregate Carryover Amount."

● Abbott would update Hancock at least yearly about the project, providing an "Annual Research Plan" with a budget for future spending. Abbott would also provide yearly "Status Reports" stating the company's spending on the joint project so far. Hancock's payments were due 30 days after receiving these documents.

● In certain enumerated circumstances, including if Abbott "does not demonstrate in its Annual Research Plan its intent and reasonable expectation" to spend at least the Aggregate Spending Target in joint funds on the project "during the Program Term," Hancock's funding obligations would terminate but the rest of the contract (detailing how the parties would share profits) would remain in effect.

● Even if one of the enumerated terminable events came to pass and Hancock's payment obligations were cancelled, Hancock would still have to pay its contributions for the year in which the terminable event took place.

## B. The parties' dealings

### 2001

Abbott's first "Annual Research Plan" was appended to the final contract, which was executed on March 13, 2001. It called for total project spending almost double the Aggregate Spending Target by the end of 2004. Under this plan, Abbott would spend many millions of dollars of its own funds, or roughly five times as much as Hancock, through the end of 2004. During 2001, Abbott decided to halt development of some compounds. In November, Abbott

-5-

sent Hancock a document titled "2002 Preliminary Annual Research Plan," which called for total spending of less than Abbott's first Annual Research Plan but more than the Aggregate Spending Target through 2004. In December, Abbott sent the "2001 Status Report" on the year's spending, revealing that spending on the project would total multiple millions less by year's end (compared to the amount that had been planned). Abbott's cover letter for the "2001 Status Report" stated that Hancock's 2001 payment was due in 30 days, an indication that Abbott believed its contractual obligations for the year had been satisfied. This was so even though the only "Annual Research Plan" Abbott had given Hancock was marked "Preliminary." Abbott did not manifest any intention to send an update to the "2002 Preliminary Annual Research Plan." Apparently agreeing that the "Preliminary" plan satisfied Abbott's reporting obligation for 2001, and that Abbott's obligations for that year were complete, Hancock timely provided its 2001 contribution of multiple millions.

**2002**

In 2002, Abbott decided to terminate development of an additional compound because the scientific results did not warrant further development. Abbott also dramatically reduced efforts on some other compounds. As a result, less than two years into the joint project, Abbott was pursuing a significantly smaller number of the original basket of compounds with full effort. Abbott submitted its "2002 Status Report" and the "2003 Preliminary Annual

Research Plan" together on December 20, 2002. The Status Report revealed that 2002 spending on the project would be far less than the "2002 Preliminary Annual Research Plan" had promised. The Plan stated that spending for 2003 would also be significantly less than Abbott had estimated the year before. The Plan, however, was silent as to 2004. Unlike the previous year's version, the Plan divulged the company's planned spending only for the next year. (Abbott later explained that the 2004 numbers had not been listed in the "2003 Preliminary Annual Research Plan" because of a computer error.) As it had the previous year, Abbott stated in a cover letter, also sent on December 20, that Hancock's 2002 contribution was due in 30 days. Again, Abbott manifested no intention to update its "Preliminary" report and gave no indication that the document was not the planning statement required by the contract. Hancock timely provided its reimbursement of multiple millions.[2]

**2003**

During further review of the "2003 Preliminary Annual Research Plan," Hancock noticed the document's failure to make any prediction of spending in 2004, a lapse that the company appears to have overlooked on its initial review. During a September 9, 2003 conference call, Hancock asked Abbott to supplement the plan with

_____

[2] The 30th day after December 20 was January 19, a Sunday. Hancock tendered its payment the next business day. Abbott accepted the payment without comment and agrees that it was timely.

-7-

the missing information.  Abbott's Controller then sent Hancock a letter, dated September 22, 2003, stating the following:

> I went back to review the data and spend estimates made about 1 year ago for 2003.  On 8/26/02, the estimated program spend for 2003 was at [more than indicated in the 2003 Preliminary Annual Research Plan].  By October 14, 2002, after the Executive Committee's portfolio review, the estimated spend for 2003 had dropped to [approximately the same amount as in the 2003 Preliminary Annual Research Plan] and for 2004, it was at [an amount that when added to the spending for 2001, 2002 and 2003 was less than the Aggregate Spending Target].

This was an important admission.  Abbott confirmed that if there had been no computer error and the "2003 Preliminary Annual Research Report" had included planned spending for 2004, it would have shown that Abbott planned to spend only an amount less than previously projected, which would mean that spending through the end of 2004 would total -- at the most -- an amount less than the Aggregate Spending Target.  The earlier status reports had indicated that Abbott's spending for 2001 and 2002 would be higher.  In its October 2002 reviews, Abbott had projected higher spending for 2003 and for 2004.

To the same September 22, 2003 letter, Abbott attached a document it called "the Final 2003 Plan."  This version of the 2003 plan indicated that Abbott's spending during the Program Term would be even lower than it had projected in October 2002.  Abbott forecasted total spending of less than the Aggregate Spending Target through 2004 and an additional amount in 2005.  Under this

-8-

projection, total spending through 2004 would fall many millions short of the Aggregate Spending Target. However, Abbott would exceed the threshold if 2005 spending were included.

After reviewing the updated 2003 plan, Hancock sent Abbott a letter, dated October 10, stating that its "obligation to make any remaining Program Payments to Abbott for [2003 and 2004] is terminated" because "the Final 2003 Plan, in conjunction with the more limited information contained in the Preliminary 2003 Annual Research Plan . . . did not, and does not, reasonably demonstrate Abbott's intent and reasonable expectation to" spend the Aggregate Spending Target on the joint project "during the Program Term."

Shortly thereafter, Abbott sent Hancock a "2004 Preliminary Annual Research Plan," which projected total project spending for 2004 and 2005. Cumulative spending on the project would be less than the Aggregate Spending Target through 2004 and more than the Aggregate Spending Target through 2005. The same document indicated that Abbott would spend well below the annual minimum in 2003 provided for under the contract.

Hancock never made a contribution for 2003. Rather, the company sued Abbott in the district court for a declaratory judgment that its payment obligations had terminated. After pretrial proceedings, the parties consented to have the district court resolve their dispute on the papers as a "case stated," meaning that the district court "could make findings of fact

instead of granting inferences to each non-movant in turn." DiGregorio v. Hartford Comp. Employee Ben. Serv. Co., 423 F.3d 6, 12 (1st Cir. 2005).  In due course, the district court issued a thorough 65-page opinion, finding in Hancock's favor both on the question of whether Abbott was required to plan on spending at least the Aggregate Spending Target through 2004, and on whether Abbott's failure to do so allowed Hancock to cancel its 2003 payment, as well as its payment for 2004.

## II.

The district court determined that, for the most part, the contract between the parties was "unambiguous and that the interpretation proffered by Hancock is the only reasonable one." The district court did identify two ambiguities in the contract that were relevant to the dispute between the parties.  As to one of these ambiguities, which we explain later in this opinion, the district court considered extrinsic evidence and made findings of fact on the intent of the contracting parties.  As we also explain, the other "ambiguity" identified by the district court was really an issue of contract interpretation, and was resolved as such.  On both issues, the district court concluded that Hancock had the stronger case.

On appeal, Abbott challenges the district court's findings and conclusions with three arguments.  First, Abbott says that the contract allowed it to plan to spend the Aggregate Spending Target

over five years instead of four. Anticipating the possible rejection of this claim, Abbott also makes two alternative arguments that, if accepted, would entitle it to Hancock's 2003 payment of multiple millions. Abbott says that the event allowing Hancock to stop paying happened in 2003, not 2002, and so Hancock had to make its payment for that year.[3] Even if the relevant event happened in 2002, meaning that Hancock was potentially freed of its obligation to make a 2003 payment, Abbott contends that Hancock waived that right by failing to recognize the 2002 event promptly. We address these arguments in turn.

## A. Jurisdiction and standard of review

Like the district court, we will accept the parties' agreement on forum selection and choice of law. The contract allows any disputes between the parties to be decided in the federal district court in Massachusetts. Based on the parties' complete diversity of citizenship and the dollar amount at issue, this case is properly in federal court. See 28 U.S.C. § 1332. The contract calls on us to apply Illinois contract law (Abbott is based in Illinois), which the parties agree should govern. We are "free to forego independent inquiry and accept that agreement." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).

As to matters of law decided on summary judgment, such as

---

[3] As we noted above, the contract provided, "For the avoidance of doubt, [Hancock's] Program Payments for the Program Year in which [a terminable] event occurs shall still be due and payable."

-11-

contract interpretation, our review is de novo. See Utica Mutual Ins. Co. v. Weathermark Investments, Inc., 292 F.3d 77, 80 (1st Cir. 2002). If it were necessary to review the district court's factual findings, our review would be far more deferential. See Principal Mutual Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000). However, as we will discuss, we believe that the contract is unambiguous on the points necessary for the disposition of this appeal, permitting us to affirm on the plain meaning of the contract alone. See States Res. Corp. v. The Architectural Team, Inc., 433 F.3d 73, 80 (2005) (recognizing that the court of appeals can affirm a grant on summary judgment on any basis made apparent by the record).

## B. Abbott's planning obligations

Hancock's position is easily summarized. The contract allowed Hancock to stop paying if Abbott did not "reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of [the Aggregate Spending Target]" (emphasis added). The contract defines "Program Term" as "a period of four (4) consecutive Program Years" (emphasis added). The contract defines "Program Year" as "a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date and end on December 31, 2001." This means, according to Hancock, that the

-12-

"Program Term" ended on December 31, 2004, and that Abbott was required to budget in its "Annual Research Plans" to spend the Aggregate Spending Target by that date. Since Abbott planned to spend less than the Aggregate Spending Target by the end of 2004, Hancock could stop paying.

Abbott's more complicated position relies on the fact that the "carryover" provisions in the contract allowed the company to postpone actual attainment of the Aggregate Spending Target threshold until the end of 2005. According to Abbott, the carryover provisions, by implication, also freed the company of any obligation to plan to spend all of the Aggregate Spending Target by the end of 2004. Hancock counters that the carryover provisions do not by their terms apply to Abbott's planned spending, but only to its actual spending. The sense of this distinction, Hancock and the district court agreed, is that unforseen circumstances during the fourth year might reasonably have been thought by the contract's drafters to excuse strict compliance with the contractually agreed spending, even if a mere change in plans on Abbott's part would not.

Hancock has by far the stronger argument. As the district court recognized, Abbott's approach is belied by the contract's definition of "Program Term."

In Illinois, as elsewhere, "[i]t is a basic and fundamental tenet of contract law [] that even if a contract offers only a

limited definition of a term, it must be applied as written." Conn. Specialty Ins. Co. v. Loop Paper Recycling, Inc., 824 N.E.2d 1125, 1133 (Ill. App. 2005).  Put another way: "A court . . . may not interpret [a] contract in a way contrary to the plain and obvious meaning of its terms."  Krilich v. American Nat. Bank & Trust Co. of Chicago, 778 N.E.2d 1153, 1164 (Ill. App. 2002).  See also In re Blinds to Go Share Purchase Litigation, 443 F.3d 1, 7 (1st Cir. 2006) ("Where the parties to a contract take pains to define a key term specially, their dealings under the contract are governed by that definition."); Alexian Bros. Health Providers Ass'n v. Humana Health Plan, Inc., 330 F. Supp. 2d 970, 975 (N.D. Ill. 2004) ("[P]arties to a contract may serve as their own lexicographers and may assign a particular meaning to any word they choose.").

In light of these precedents, we need look no further than the contract's own definition of "Program Term" as "a period of four (4) consecutive Program Years."  When the contract said that "Hancock's obligation to make any remaining Program Payments . . . shall terminate" if Abbott did not "reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of [the Aggregate Spending Target]" (emphasis added), the contract meant that Hancock could stop paying if Abbott did not "demonstrate . . . its intent and reasonable expectation" to spend

-14-

the money by the end of 2004.  Abbott insists that "[n]owhere does [the contract] provide that Abbott must forfeit Hancock's payments if Abbott forecasts [] that it will need [a] fifth year" to spend the Aggregate Spending Target.  But the contract provides exactly that.

As the district court stated, reading the contract as it was written does not somehow make the contract illogical, irrational, or "commercially unreasonable."  Cf. Beanstalk Group, Inc. v. A.M. Gen. Corp., 283 F.3d 856, 860 (7th Cir. 2002) ("[A] contract will not be interpreted literally if doing so would produce absurd results that the parties, presumed to be rational persons pursuing rational ends, are unlikely to have agreed to seek.").  Abbott and Hancock reasonably could agree that Abbott would be bound by the contract to make all reasonable efforts to spend the Aggregate Spending Target on the joint project by the end of 2004.  Hancock had obvious reasons to prefer such an obligation: the more Abbott spent on the project during its first four years, the greater Hancock's returns were likely to be.  Abbott had good reasons to accede to Hancock's demands:  Hancock provided an enormous infusion of funds on favorable terms.  And Abbott and Hancock reasonably could agree that, despite Abbott's obligation to make all reasonable attempts to spend the Aggregate Spending Target through 2004, the company should have the ability to stretch its actual expenditure of funds into a fifth year, if unexpected events during

-15-

2004 made it impossible to spend the money as soon as planned.  The parties shared an interest in avoiding unnecessary or inefficient last-minute spending on the project.  In light of these plausible goals, it made sense for the contract to provide that Abbott was required to <u>plan</u> to spend the Aggregate Spending Target by December 31, 2004, but that it was not required to actually spend the money by that time.  Whether this was the best, fairest, or most efficient way to structure the contract is not our concern.[4]

Referring to the rule that a contract must be read as a whole, Abbott places great reliance on the appearance of the phrase "any extension period of the Program Term" in the contractual definition of "Program Related Costs."  "Program Related Costs," not otherwise relevant here, were costs that Abbott could count as expenditures on the joint program.  The definition provided:

> "Program Related Costs" shall mean (i) all direct and indirect costs and expenses that are incurred by Abbott during a given Program Year . . . and (ii) the milestone and license fees paid during a given Program Year or during any extension period

---

[4] Abbott says repeatedly -- in its brief and at oral argument -- that the contract must be read to impose a two to one ratio of Abbott's spending to Hancock's.  Abbott criticizes the district court for allowing actual spending in roughly a four to one ratio. But the contract never required Hancock to spend half as much as Abbott. Indeed, Abbott's initial projection was that it would spend five times as much as Hancock. What the contract did not allow was for Abbott to spend <u>less</u> than 1.87 times as much as Hancock (Hancock's maximum contribution was approximately one-third of the Aggregate Spending Target, and Abbott's minimum was approximately two-thirds of the Aggregate Spending Target).  Our resolution of this dispute is fully consistent with these principles agreed to by the parties.

-16-

of the Program Term . . ..

According to Abbott, the phrase "extension period" in the above-quoted paragraph frees the company from any obligation to plan for spending the Aggregate Spending Target by the end of 2004.

The district court found Abbott's "extension period" argument unpersuasive.  We agree, though for different reasons.[5]  The language Abbott relies on does not purport to alter the meaning of "Program Term," which is the definition that matters in the section allowing Hancock to terminate its payments.  As the district court stated, "the Agreement defines 'Program Term' specifically and without exception as 'a period of four (4) consecutive Program Years. . . .  Thus, the Program Term, as defined by the Agreement, ran from March 13, 2001 through December 31, 2004."  The contractual relationship between Abbott and Hancock would continue beyond the end of 2004, the district court recognized, because Abbott would remain responsible for making payments to Hancock. But that continuation did not free Abbott from its obligation to plan to spend the Aggregate Spending Target during the "Program Term" itself.  Additionally, there are contextual clues far more

_____

[5] The district court found the "extension period" language ambiguous.  It then conducted a skillful and convincing analysis of some 40 contract drafts that preceded the final version.  On the basis of that review, the district court found that "extension period" was a "vestige" from a previous draft that the parties mistakenly failed to delete from the final contract.  If we were not able to resolve the issue on the plain language of the contract, we would readily adopt the district court's factual findings on the ambiguity.

relevant to this controversy that eliminate any chance that the parties to the contract intended the "Program Term" to be five years rather than four. For instance, the very carryover provisions Abbott relies on refer to the "Program Term" and "the subsequent year commencing immediately after the end of the Program Term." The only plausible reading of the contract is that "the subsequent year commencing immediately after the end of the Program Term" is the year 2005. The "Program Term" itself ended on December 31, 2004.

In short, the contract required that Abbott plan to spend the Aggregate Spending Target during the "Program Term." The contract defined the "Program Term" as the period beginning on the day the contract was signed and ending on December 31, 2004. Abbott unambiguously revealed in its 2003 plan that it did not plan to spend the Aggregate Spending Target by the end of 2004. Therefore, under the terms of the contract, Hancock could terminate its payments.

## C. The year of the terminable event -- 2002 or 2003?

Abbott argues in the alternative that, even if Hancock could withhold its 2004 payment in light of Abbott's failure to forecast spending the Aggregate Spending Target through 2004, Hancock could not cancel its 2003 payment. Abbott rests this argument on wording in the same section of the contract that allowed Hancock to stop paying if Abbott did not "reasonably demonstrate in its Annual

-18-

Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of [the Aggregate Spending Target]." The wording states: "For the avoidance of doubt, [Hancock's payments] for the Program Year in which [an event that allows the termination of payments] occurs shall still be due and payable." Abbott says that Hancock stopped paying on the basis of events that happened in 2003 and that the 2003 payment was therefore still due. In response, Hancock says that the event allowing it to terminate its payments was Abbott's December 2002 "2003 Preliminary Annual Research Plan," which failed to manifest any intention by Abbott to spend the Aggregate Spending Target on the joint project by the end of 2004. We agree with the district court that Hancock was not required to make a 2003 payment.

Abbott argues that the December 20, 2002 document cannot be considered a ground for termination for two reasons: because it was marked "Preliminary" and because it did not include any statement of planned spending for 2004. Neither of these rationales is convincing. Hancock was not obligated to wait for an annual research plan labeled "Final." When Abbott sent Hancock the "2003 Preliminary Annual Research Plan" in December 2002, it also said that the 30-day period for Hancock's payment was running, a sure indication that Abbott considered its yearly reporting obligations

to be complete.[6]  This demand for payment conformed to Abbott's practice from the previous year of treating a "Preliminary" annual plan as the "Annual Plan" required by the contract.  Additionally, Abbott gave no indication that another plan, which might indicate satisfactory planned spending for 2004, was coming.

Abbott also says that the December 2002 document was not a terminable event because it did not contain any projections for 2004.  This argument fails in light of the contractual language and Abbott's later admissions.  As we discussed above, the contract allowed Hancock to terminate its payments if Abbott did "not demonstrate in its Annual Research Plan its intent and reasonable expectation" to spend at least the Aggregate Spending Target in joint funds on the project "during the Program Term."  The "2003 Preliminary Annual Research Plan," submitted in 2002, plainly did "not demonstrate" any intention by Abbott to spend the Aggregate Spending Target through 2004.  Actually, due to the computer glitch, the document "did not demonstrate" a plan to spend anything at all in 2004.  But -- as Abbott later admitted -- even if the document had been complete, it would have shown "the estimated

---

[6] Under the contract, Abbott was supposed to send Hancock the Annual Research Plan "at least forty-five (45) days prior to the start of each Program Year" and the Status Report "no later than thirty (30) days before the last day of each Program Year." Hancock was not expected to make its payments any earlier than December 1 of the year in which they were due.  The contract allowed Hancock to delay its payments until 30 days after it had received both the Status Report and the Annual Research Plan.

spend for 2003 had dropped to [approximately the same amount as in the 2003 Preliminary Annual Research Plan] and for 2004, it was at [an amount that when added to the spending for 2001, 2002 and 2003 was less than the Aggregate Spending Target]."  Given this admission by Abbott, Abbott's "2003 Preliminary Annual Research Plan," submitted in December 2002, failed to manifest the company's intent to spend the required amount through 2004.  As Hancock points out, it was not relieved of its payment obligations merely because another party failed to correct a computer glitch.  If Hancock had requested clarification of the December 20, 2002 plan, Abbott would have stated that it no longer planed to spend the Aggregate Spending Target by the end of 2004.

The district court provided a slightly different gloss on the same conclusion that the terminable event happened in 2002, relying on the principle of contract interpretation that "if possible, effect must be given to all of the language so that provisions which appear to be conflicting or inconsistent may be reconciled and harmonized."  In re Halas, 470 N.E.2d 960, 964 (Ill. 1984).  We also find the district court's analysis persuasive.[7]

As the district court concluded:

---

[7] While the district court suggested that there was an ambiguity to resolve in this analysis, the district court also stated that the issue "translated into a contractual interpretation argument" and required no parol evidence.  Because a careful reading of the contract itself resolved the issue, there was no need to resolve any ambiguity.

-21-

> [I]t is clear [from the contract language] that the parties intended Abbott to present an [Annual Research Plan] prior to the start of each Program Year that would include . . . budgets for the remaining Program Years in the Program Term. Thus, the parties intended that the [Annual Research Plan] for 2003 would be submitted to Hancock in 2002 and it would include . . . budgets for 2003 and 2004. As a result . . . Abbot's <u>failure to demonstrate</u> its intent and reasonable expectation to expend at least [the Aggregate Spending Target by the end of] 2004 [] took place in 2002, not 2003.

(Emphasis added.) To hold otherwise, the district court reasoned, would allow Abbott "to obtain two Program Payments (for 2002 and 2003) for the price of one payment obligation termination." As the district court emphasized, the contract gives Abbott one yearly Hancock payment for each conforming year of Abbott's performance. The contract would be subverted if Abbott could require an extra payment by Hancock merely because it was late in submitting complete projections.

## D. Waiver or estoppel

Abbott's final fallback argument is that Hancock waived the right to cancel its 2003 payment by waiting until the fall of 2003 to notify Abbott that it considered its payment obligations terminated. We agree with the district court that Hancock did nothing that could establish a waiver or estoppel under Illinois law.

In Illinois, waiver is the "voluntary relinquishment of a known right, claim, or privilege." <u>Vaughn</u> v. <u>Speaker</u>, 533 N.E.2d

-22-

885, 890 (Ill. 1988). It may be "express or implied." <u>Geier</u> v. <u>Hamer Enters. Inc.</u>, 589 N.E.2d 711, 722 (Ill. App. 1992). Equitable estoppel may be found where a party indicates through its conduct that it will not enforce its contractual rights in a timely fashion and the other party reasonably relies on that conduct to its detriment. <u>See</u> <u>Geddes</u> v. <u>Mill Creek Country Club</u>, 751 N.E.2d 1150, 1157 (Ill. 2001). Abbott's waiver and estoppel arguments share a common problem: they do not establish that Hancock conveyed any intention to relinquish a contractual "right or privilege." We discuss briefly Abbot's three principal waiver and estoppel arguments, resolving them on this common ground.

Abbott first argues that Hancock should have made an earlier notification that it planned to terminate its payments. However, the contract does not contain any requirement that Hancock notify Abbott when a terminable event occurred. To the contrary, the contract states that "Hancock's entire obligation [under the contract] shall be limited to providing [its] program payments." Further, the contract provides that "[t]he waiver by either party hereto of any right hereunder or the failure to perform or of a breach by the other party shall not be deemed a waiver of any other right hereunder . . .." Hancock could not waive its right to terminate payments by failing to provide a notification that it was not required to make.

-23-

Abbott also contends that Hancock indicated that it was satisfied with the December 2002 "2003 Preliminary Annual Research Plan" by tendering its 2002 payment upon receipt of that document, and that Abbott relied on that payment as an indication that the December 20, 2002 plan was sufficient. But Hancock's payment for 2002 could not have been any indication that Hancock considered the "2003 Preliminary Annual Research Plan" as compliant with Abbott's planning obligations. Even if Hancock considered the plan a breach by Abbott, Hancock had no choice but to make its 2002 payment. After all, the contract provided that Hancock's payment "for the Program Year in which [an event that allows the termination of payments] occurs shall still be due and payable." Abbott's breach occurred in 2002. Hancock paid for 2002. That is merely what the contract required.

Abbott finally claims that Hancock forfeited its right to deem the December 2002 "2003 Preliminary Annual Research Plan" a terminable event by failing to make a timely request for a 2003 Annual Research Plan that included planned spending for 2004. This argument represents an attempt by Abbott to shift its own responsibilities to Hancock. The contract made it abundantly clear that all responsibility for planning and funding rested with Abbott. Hancock's only obligation was to provide large payments when Abbott submitted conforming documentation. Given this arrangement, it was reasonable for both parties to accept the "2003

Preliminary Annual Research Plan," submitted in December 2002, as Abbott's final word on the subject. That December 2002 plan allowed Hancock to terminate its payments because it did not manifest Abbott's intention to spend the contractually prescribed amount during the Program Term (and because any request for clarification of the document merely would have confirmed that Abbott did not intend to spend enough during the Program Term). Hancock did not have to ask for clarification before it deemed the December 2002 Plan a breach by Abbott allowing it to terminate its payments.

**Affirmed.**